[No. 57563-1.   En Banc.   April 9, 1992.]

THE DEPARTMENT OF ECOLOGY, *Respondent*, v. THE
UNITED STATES BUREAU OF RECLAMATION,
*Defendant*, QUINCY-COLUMBIA BASIN
IRRIGATION DISTRICT, ET AL,
*Appellants*.

*Lemargie & Whitaker,* by *Richard A. Lemargie; Baird & White,* by *John W. Baird,* for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *Thomas McDonald, Assistant,* for respondent.

JOHNSON, J. — The Washington State Department of Ecology (Department) granted to J.M. Hanson a permit to appropriate water from a stream running across his property. Hanson's property is located within the boundaries of a federal irrigation project and the stream carries, at least in part, water that the project diverted from the Columbia River pursuant to the federal government's own rights of appropriation.

A federal agency and three irrigation districts appealed the Department's action to the Pollution Control Hearings Board (PCHB), arguing that the permit interfered with the federal government's prior appropriated rights in the water. The PCHB decided on summary judgment that the federal government's rights prevented reappropriation to

another party. The Superior Court reversed the PCHB and remanded for further factfinding. The irrigation districts appealed directly here.

We hold the Department erred in granting Hanson's permit. The water in Hanson's stream is still subject to the federal government's right of appropriation, as it has not yet left the boundaries of the irrigation project, and it cannot be reappropriated to another. We reverse the Superior Court and reinstate the PCHB's summary judgment.

I

The Columbia River Basin Irrigation Project is a massive federal project providing irrigation water for lands along the Columbia River.[1] In order to undertake this project, the federal government acquired appropriation rights in the Columbia River. The federal government then built the facilities necessary to divert that water and make it available to farmers in the Columbia River basin. The federal government, through the United States Bureau of Reclamation, contracted with local irrigation districts to operate and maintain the facilities and to deliver the water to the basin's farmlands. The contracts provide for repayment of the federal government's costs of constructing the facilities.

Certain farmlands (known as "farm units") receive a direct water supply from the irrigation districts. In return, the farm units pay a proportionate share of the cost of the facilities.

After these farm units use the water for irrigation, significant amounts of the water seep through the land and accumulate, either above or below ground, within the project's borders. The parties refer to this water as "waste, seepage or return flow water", abbreviated as "WSRF water".

These WSRF waters are addressed in the contract between the United States Bureau of Reclamation and the

---

[1] The record in this case contains little direct evidence. Accordingly, much of the factual description here relies on uncontradicted statements made in the parties' briefs and in opinions from the Superior Court and the PCHB.

local irrigation districts. That contract expressly reserves these waters for use by the project:

> The United States does not abandon or relinquish any of the waste, seepage, or return flow waters attributable to the irrigation of the lands to which water is supplied under this contract. All such waters are reserved and intended to be retained for the use and benefit of the United States as a source of supply for the project. . . .

Amendatory, Supplemental and Replacement Repayment Contracts § 24(a); Supplemental Clerk's Papers, at 107.

Although some of the WSRF water returns to the Columbia River without being used for further irrigation, the project does recapture and reuse a portion of the used water. The irrigation districts enter into "water service contracts" with area landowners granting the landowners the right to divert the previously used water for purposes of further irrigation. These landowners pay a portion of the project's construction and maintenance costs, but a smaller portion than that charged to the landowners who used the water initially. The landowners entering into water service contracts pay for their own costs of capturing and diverting the runoff water.

J.M. Hanson owns farmland within the boundaries of the federal project and he receives water from the project to irrigate portions of his land. In the early 1980's, Hanson became interested in obtaining more water to irrigate an additional 30 acres of his land. Particularly, he wanted to divert water from an unnamed stream flowing across his property.

A significant portion of the water in Hanson's stream is WSRF water from other project lands. The stream originates in a spring that arises from the ground on Hanson's property, approximately 1,500 feet upstream from his proposed point of diversion, which in turn is fed by underground water that has drained off from the irrigation of other farmland in the project.

The stream carries the water across Hanson's land and then, within a mile of his proposed point of diversion,

empties into the Columbia River. The land downstream from Hanson's is undeveloped and currently has no use for project waters. The project currently has no facilities in place along this stream with which it could recapture this WSRF water, and it currently has no intention of building such facilities in the future.

Because the stream contains WSRF water from the project, Hanson first inquired at his local irrigation district — the Quincy-Columbia Basin Irrigation District — about obtaining a water service contract. According to Hanson, the irrigation district "discouraged" his attempt to obtain water.[2]

Hanson then applied to the Department of Ecology in order to obtain his own independent rights of appropriation in the stream. The United States Bureau of Reclamation opposed Hanson's application. The Bureau argued that the WSRF water in Hanson's stream had already been appropriated to the federal government, thereby precluding any further reappropriation.

The Department investigated Hanson's application and the Bureau's objection. It determined that the statutory requirements for granting the permit were met: public surface water was available for appropriation for a beneficial use; the water was to be put to a beneficial use (irrigation); and appropriation would not impair existing rights or be detrimental to the public welfare. *See* RCW 90.03.290. Accordingly, the Department granted Hanson's permit application.

The Bureau of Reclamation appealed the Department's decision to the Pollution Control Hearings Board. Joining in the appeal were the Quincy-Columbia Basin Irrigation District and two neighboring irrigation districts.[3]

---

[2]The record is unclear as to whether the irrigation district formally denied an application for a water service contract, or whether instead Hanson was merely discouraged from making a formal application.

[3]The other districts are the East Columbia Basin Irrigation District and the South Columbia Basin Irrigation District.

The PCHB concluded that the project's WSRF water in Hanson's stream was still subject to the federal government's appropriation rights. Because appropriated water is not public water and it cannot be reappropriated, the PCHB issued a summary judgment reversing the permit's issuance.

The Department appealed to the Grant County Superior Court,[4] which reversed the PCHB. The superior court judge ruled that federal rights of appropriation in specific particles of water end when the project is no longer able, willing or intending to beneficially use the water and has lost effective control over it, even if that water is still within the project's physical boundaries. Applying this principle to the present case, the Superior Court concluded that the project's WSRF water is public water available for appropriation when three circumstances concurrently exist:

a) At the proposed point of diversion, the water is bound in its course for immediate departure from the project;
b) The Bureau of Reclamation and irrigation districts have no downstream recapture facilities and no intention to recapture the water; and
c) The proposed location for use of the water is on land ineligible for service by the Bureau or districts.

The court found that the first two circumstances existed, but remanded to the PCHB for factfinding on the third circumstance.

Quincy-Columbia and the other two irrigation districts appealed directly to this court. The Bureau of Reclamation did not join in the appeal.

## II

As a general matter, water in this state is publicly owned. *See* RCW 90.03.010 ("[s]ubject to existing rights all waters within the state belong to the public . . ."). Private individuals and organizations, however, may acquire a right to use these public waters. RCW 90.03.010. This is known as a water right or a right of appropriation.

---

[4]Hanson did not join in the Department's appeal, and consequently is not involved in the proceedings in this court.

The statute governing water appropriation permits is RCW 90.03.290. Under that statute, the Department must issue a permit if water is "available for appropriation for a beneficial use, and the appropriation thereof as proposed in the application will not impair existing rights or be detrimental to the public welfare . . .". If these conditions are not present, however, the Department must deny the application. More specifically, if water has already been appropriated to one entity, it cannot be reappropriated to another. RCW 90.03.290.

▮▮▮ The Department's decision to issue water appropriation permits under RCW 90.03.290 is discretionary and will not be reversed "absent a clear showing of abuse". *See Schuh v. Department of Ecology*, 100 Wn.2d 180, 186, 667 P.2d 64 (1983). A party seeking a reversal under this standard must show that "the discretion was exercised in a manner which was manifestly unreasonable or exercised on untenable grounds or for untenable reasons." *Schuh*, at 186. On issues of law, an appellate court may substitute its judgment for that of the agency, but the agency's interpretation of the law is given substantial weight due to the agency's special expertise. *Schuh*, at 183-84.

Accordingly, we must decide whether the Department abused its discretion in interpreting RCW 90.03.290. At particular issue is whether the water in Hanson's stream is still subject to the federal government's prior right of appropriation. If the federal right still applies to this water, then the Department may not grant any conflicting appropriation rights in the water.[5]

▮▮ The holder of a water right owns no title to any molecules of water until that water is diverted. Once an appropriator diverts water and brings it under his control and possession, the appropriator owns it as personal property. *Madison v. McNeal*, 171 Wash. 669, 674, 19 P.2d 97 (1933). This principle is generally held throughout the

---

[5]We make no comment on whether the Department would be authorized to issue "nonconsumptive" appropriation rights in water already appropriated to another. *See* AGO 8 (1968).

Western States. *See* 1 S. Wiel, *Water Rights in the Western States* § 35 (3d ed. 1911); 2 C. Kinney, *Irrigation and Water Rights and the Arid Region Doctrine of Appropriation of Waters* §§ 773, 774 (2d ed. 1912); 1 W. Hutchins, *Water Rights Laws in the Nineteen Western States* 144 (1971).

■ The appropriator's rights in the particular molecules of diverted water do not necessarily end when the water has been used once for irrigation. *See Ide v. United States*, 263 U.S. 497, 506, 68 L. Ed. 407, 44 S. Ct. 182 (1924). An appropriator has a right to recapture and reuse this WSRF water, even under certain circumstances, when the water has left the appropriator's land and entered a natural watercourse. *Ide*; *Jensen v. Department of Ecology*, 102 Wn.2d 109, 114-15, 685 P.2d 1068 (1984).

This much the parties agree on. Where the parties differ is with regard to when the appropriator's rights in particular molecules of water end.[6]

The irrigation districts cite to a line of cases holding that an appropriator's rights in particular water molecules extend at least as long as the water remains within the boundaries of the appropriator's property. We refer to this theory as the "geographical" test. In *Miller v. Wheeler*, 54 Wash. 429, 434-35, 103 P. 641 (1909), the court stated that landowners who irrigate using appropriated water retain the right to WSRF water while it remains on their land. This rule is also the law in other jurisdictions. One of the clearest statements of this rule is from Nevada:

> *So long as [waste] water exists upon [the plaintiffs'] lands, it is their property*, and they may consent to others acquiring rights therein upon their property and in ditches thereupon for the purpose of conveying such waters to the lands of such other parties.

---

[6]As the Department of Ecology stresses in its brief, we are not being asked to determine whether the federal government has abandoned its water rights. Abandonment of water rights has broader consequences than abandonment of water molecules. Abandoning water molecules, as opposed to abandoning water rights, does not affect the party's right to change its practices so as to recapture future supplies of diverted water. *See Stevens v. Oakdale Irrig. Dist.*, 13 Cal. 2d 343, 350, 90 P.2d 58 (1939).

> These waters, while upon the lands of the plaintiffs Bidleman, were certainly not subject to appropriation by the defendants. . . .

(Citation omitted. Italics ours.) *Bidleman v. Short*, 38 Nev. 467, 471, 150 P. 834 (1915). Similar pronouncements are found in cases from other Western States. *See Barker v. Sonner*, 135 Or. 75, 79, 294 P. 1053 (1931) (water is not even considered waste water until it has left the land of the original appropriator); *Smithfield West Bench Irrig. Co. v. Union Cent. Life Ins. Co.*, 105 Utah 468, 472-73, 142 P.2d 866 (1943); *Jones v. Warmsprings Irrig. Dist.*, 162 Or. 186, 198-99, 91 P.2d 542 (1939) (an irrigation district's water becomes free, unappropriated water when it leaves lands within an irrigation district and returns to the stream from which its was diverted, absent any attempt by landowners in the district to control it).

Here, the water in Hanson's stream is still within the boundaries of the irrigation project. Therefore, under the irrigation districts' theory, the water would still be appropriated to the project.

The Department counters that an appropriator's rights do not depend on the water's geographical location. It instead cites a number of authorities for the proposition that the duration of an appropriator's rights in particular molecules of water depends on continued control and possession of the water. One of the cases cited by the Department describes the test as follows:

> When possession of the actual water, or corpus, has been relinquished, or lost by discharge without intent to recapture, property in it ceases. This is not the abandonment of a water right, but merely an abandonment of specific portions of water, i.e., the very particles which are discharged or have escaped from control.

(Italics omitted.) *Stevens v. Oakdale Irrig. Dist.*, 13 Cal. 2d 343, 350, 90 P.2d 58 (1939). *See also Rock Creek Ditch & Flume Co. v. Miller*, 93 Mont. 248, 17 P.2d 1074 (1933). General statements of this standard seem to be fairly well accepted in the Western States. *See* 1 S. Wiel, *Water Rights in the Western States* § 37 (3d ed. 1911).

The Department of Ecology argues that under its theory the water molecules in Hanson's stream are no longer appropriated to the federal government. According to the Department, once the water reaches Hanson's proposed point of diversion, the irrigation project has discharged the water without intent to recapture, as the water is headed toward the project's outer boundary and the project has no current plans to recapture this water.

■ It appears that both the Department's "control and possession" test and the irrigation districts' geographical test are well founded in the water law of the Western States. We therefore strive to construe these lines of authority so as to give greatest possible effect to each. We conclude that an appropriator's rights in particular molecules of water do not end while the water remains within the boundaries of the appropriator's property, and that after water has left those boundaries, the termination of the appropriator's rights depends on the "control and possession" test. Accordingly, once an appropriator has discharged water from his or her own property, then the issue becomes whether the appropriator nevertheless retains an intent to recapture that water, whether downstream on another piece of property or otherwise.

Our synthesis of the two tests does not appear to violate any of the holdings of the cases cited by the Department. We have been unable to locate any cases in which the Department's "control and possession" test has been applied in a case like the present one, where the water under consideration is still within the boundaries of the original appropriator's land. The cases cited by the Department in support of its proposed standard of "control and possession" each involved circumstances where the water left the original appropriator's property. The PCHB noted as much, and the Department has not challenged this conclusion in any of the briefs it filed during this litigation.

For example, in *Rock Creek*, the company originally appropriating the water allowed it to flow from the company lands into a natural stream. Further downstream, a

stockholder of the company attempted to "recapture" the water. The court held that the company lost possession and control of the water when it "permitted the water, after being used for irrigation, to pass from their lands regardless of what might become of it." *Rock Creek*, at 268. Thus, the theories may be fully reconciled by applying the geographical test until the water has left the appropriator's lands, and the "control and possession" test after that point.

Additional support for our decision flows from the fact that the original appropriator here is a federal irrigation project that was formed for the very purpose of supplying farmers like Hanson with irrigation water. Supplying this water is an expensive undertaking, and each farmer using the water — even those using WSRF water — is required to pay a share of the costs of building and maintaining the project's facilities. Under the Department's theory, Hanson would be able to obtain the water without having to pay his fair share of the system's costs.

Moreover, if Hanson is allowed to obtain water rights without paying his portion of the system's costs, others similarly situated would have to be similarly treated. Even those landowners who currently obtain WSRF water through water service contracts — and who therefore currently contribute toward the payment of the system's costs — could potentially do so as well, for the water service contracts are terminable by landowners at the end of each year. The irrigation districts fear these landowners too would seek to avoid the system's true costs. The Bureau of Reclamation has gone so far as to maintain that the potential loss of repayment from these sources "seriously jeopardizes the successful completion of the project." While we cannot independently determine if this last assertion overstates the impact on the project, the potential for disruption to the system certainly is present.

We also find it highly significant that under Washington's statutes the decisions regarding distribution of water within a federal irrigation project do not belong to the State. Rather, they are to be made by the Secretary of

the Interior through the Secretary's representatives: the United States Bureau of Reclamation and, by contract, the irrigation districts. These decisions are to be made according to the federal laws, federal regulations and the contracts between the irrigation districts and the federal government. *See* RCW 87.03.115 (water obtained by irrigation districts from federal projects is to be distributed according to federal statutes, regulations and the repayment contracts); RCW 89.12.040 (the Secretary of the Interior administers the federal reclamation laws and provides water delivery).[7] If the Department begins granting appropriation rights in WSRF water within the project's boundaries, it will in effect be overruling the federal project's distribution decisions. This it lacks authority to do.

If Hanson is dissatisfied with the federal project's decisions regarding the distribution of project water, he should pursue whatever administrative and judicial review is provided in the federal system. He is not entitled, however, to call on a state agency to make what is a project decision.

Finally, the Department of Ecology argues that policy reasons support granting appropriation rights to Hanson. The Department notes RCW 90.03.005 establishes a public policy of maximizing the beneficial use of public water. The Department contends this policy is not fulfilled if the water in Hanson's stream is allowed to return to the Columbia River without being reused. This argument mischaracterizes the policy established in RCW 90.03.005. That statute reads in pertinent part as follows:

> It is the policy of the state to promote the use of the public waters in a fashion which provides for obtaining maximum net benefits arising from *both diversionary uses of the state's public waters and the retention of waters within streams and*

---

[7]The Department counters that federal law generally must give way to state law regarding distribution of water in federal irrigation projects. *See California v. United States*, 438 U.S. 645, 57 L. Ed. 2d 1018, 98 S. Ct. 2985 (1978); 43 U.S.C. § 383. These authorities, however, would seem to have no applicability here, where the state law expressly yields to federal provisions.

*lakes in sufficient quantity and quality to protect instream and natural values and rights.*

(Italics ours.) RCW 90.03.005.

This language makes clear that the "maximum net benefit" is not always achieved through diversionary uses such as irrigation. Greater benefits will sometimes result from retaining the water in its watercourse. The record does not provide a basis for this court to independently determine the optimal use of the water in Hanson's stream.

For all these reasons we conclude the Department abused its discretion in granting Hanson's permit application. We cannot uphold the Department's interpretation of the law when doing so would run counter to the most directly applicable principle of western water law and would improperly extend state jurisdiction over federal matters to the potential detriment of the federal irrigation project.

We reverse the Superior Court and reinstate the PCHB's summary judgment decision.

DORE, C.J., and UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, DURHAM, SMITH, and GUY, JJ., concur.