

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

CENTER FOR ENVIRONMENTAL LAW
AND POLICY, AMERICAN
WHITEWATER, and NORTH CASCADES
CONSERVATION COUNCIL,

Appellants,

v.

WASHINGTON DEPARTMENT OF
ECOLOGY; PUBLIC UTILITY DISTRICT
NO. 1 OF OKANOGAN COUNTY,
WASHINGTON; WASHINGTON STATE
POLLUTION CONTROL HEARINGS
BOARD,

Respondents.

No. 74841-6-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: July 11, 2016

APPELWICK, J. — The Pollution Control Hearings Board (PCHB) affirmed the Department of Ecology's (Ecology) issuance of a Report of Examination (ROE), ordering the approval of a water right for the Public Utility District No. 1 of Okanogan County's (PUD) hydroelectric project. The project would divert water from a portion of the Similkameen River through a powerhouse. To satisfy the public interest requirement of RCW 90.03.290, the ROE included a condition that the PUD would be required to ensure that the minimum flows in the bypass reach portion of the river would be the same as those found to be adequate to protect

aesthetic values as determined by a future study. Appellants assert that the PCHB erred in affirming Ecology's issuance of the ROE when the aesthetic study has not yet been completed and when Ecology did not condition the ROE on the minimum instream flow rule in WAC 173-549-020. We affirm.

CLEAN WATER ACT CERTIFICATION

The Enloe Dam is located on the Similkameen River near Oroville, Washington in Okanogan County. Approximately 350 feet downstream from the dam, there is a natural waterfall known as Similkameen Falls. The dam operated to produce hydroelectric power from 1922 to 1958. The PUD has owned the dam since 1945. The PUD seeks to resume hydropower operations at the dam. Consequently, it launched the Enloe Dam Project (the Project).

The Project includes constructing a new powerhouse for hydropower generation that will be situated on the bank of the river, raising the height of the existing dam by five feet and increasing the size of the reservoir behind the dam. The Project will withdraw water from the reservoir behind the dam, diverting the water around the dam and through the new powerhouse. The diverted water will be returned to the river 370 feet downstream from the dam, directly below the waterfalls. The 370-foot stretch of river impacted by the diversion is referred to as the "bypass reach."

The PUD has received various federal and state permits or approvals for the Project. The PUD received a license from the Federal Energy Regulatory Commission (FERC) for construction of the Project. That license required Ecology approval of a Section 401 Water Quality Certification (401 Certification)

2

under the authority of the Federal Clean Water Act (CWA).[1] The CWA provides that a certification made by a certifying agency—here, Ecology[2]—shall include a statement that there is a "reasonable assurance that the activity will be conducted in a manner which will not violate applicable water quality standards." 40 C.F.R. § 121.2(a)(3).

Ecology issued the 401 Certification in July 2012. Ecology had investigated the proposal for conformance with both state and federal law. Ecology found reasonable assurance that the operation of the Project would comply with state and federal water quality standards and other appropriate requirements of state law. But, it made that finding subject to several conditions. Among them, Ecology imposed conditions specifically related to the aesthetics of the Project. One such condition was that the PUD would be required to ensure that the Project divert water from the reservoir, pipe it around the dam, and release it near the base of the dam. This would be done at a rate of 30 cubic feet per second (cfs) from September 16 to July 15 and 10 cfs ("10/30 flows") from July 16 to September 15, for aesthetic purposes as well as for fish and other aquatic life purposes. This condition was ostensibly to prevent water from warming as it flowed over the dam and through the bypass reach—something that would be harmful for fish. The condition did not require a minimum flow over the dam. Ecology also required a monitoring program for the period of the license, with a five year adaptive management approach that required increasing

---

[1] 33 U.S.C. §§ 1313, 1341
[2] RCW 90.48.260 states that the Department of Ecology is designated as the state water pollution control agency for purposes of the CWA.

3

and resetting the minimum flows for a season in which water quality standards were violated.

Several organizations—including the appellants—appealed Ecology's 401 Certification to the PCHB. One issue in the appeal was whether the 10/30 flows would impair the aesthetics of water flowing over the dam and the falls. Following cross motions for summary judgment, the PCHB decided that the 401 Certification provided reasonable assurance the Project would comply with applicable water quality standards regarding temperature, recreation, salmonid spawning, rearing, and migration. But, regarding aesthetics, the PCHB denied summary judgment as to the issues regarding aesthetics for flows over the dam and the falls. Specifically, was there a reasonable assurance that water quality standards will not be violated regarding (1) Ecology's finding that no minimum flows are required over the dam, and (2) the adequacy of the 10/30 flows Ecology established for flows over the falls? As to the first issue, the PCHB stated that while the dam is not a natural feature, it has created an aesthetic feature on the river for many decades. And, it stated that minimum flows over the dam should be considered in determining whether the 401 Certification properly provides assurance that the operation of the Project will not violate the water quality standards regarding aesthetics. As to the second issue, the PCHB noted that there were disputed issues of material fact, because experts stated

that 10/30 flows did not protect aesthetic values of either the dam or the natural falls. Consequently, the PCHB held a hearing on these issues.[3]

On August 3, 2013, the PCHB issued a final decision in the 401 Certification appeal. The PCHB found that if a gate limited the surface water flow over the dam to a 10-foot width of flow, the temperature of the water as it flows over the dam would not increase at either 10 cfs or 30 cfs. The PCHB concluded that expert opinions were not determinative of whether the 10/30 flows, which included no flows over the dam, was aesthetic. The PCHB concluded that the evidence before Ecology as to the impact on aesthetics—based on an expert's "visualization" of the flows, modeling based on aesthetic flows at 20, 40, and 80 cfs, and photo simulations of the views of the falls—was inadequate. It concluded that there was insufficient evidence to make a finding that the 10/30 flows meet the water quality standards for aesthetic values even when considering protecting the fisheries. The PCHB concluded that Ecology must develop a monitoring program of the visual effect of the different flow levels, which can be implemented as the Project commences and becomes capable of controlling flows over the dam and the falls. It mandated that the flow plan

---

[3] The CWA states that any applicant for a federal license or permit to conduct any activity, which may result in any discharge into navigable waters, shall provide the licensing or permitting agency a certification from the State that the activity will comply with all applicable state and federal water quality standards and any other appropriate requirement of state law. 33 U.S.C. § 1341(a)(1); 33 U.S.C. § 1341(d). The PCHB noted that the protections for aesthetics in RCW 90.54.020(a) and (3)(a)—general declaration of fundamentals for utilization and management of waters in Washington—is recognized as an "other appropriate requirement of state law" under the CWA § 401.

5

should include an analysis of the flows over the dam within the proposed 10-foot wide release area.

Ultimately, the PCHB affirmed the 401 Certification subject to additional conditions:

> The §401 Certification is affirmed, subject to the additional condition that 10/30 cfs minimum instream flows over the Dam and Falls for the aesthetic values shall be further monitored and evaluated by Ecology during initial operation of the Project (within three years). After Ecology obtains additional data and analysis of alternative flows over the Dam and the Falls, the 10/30 cfs flow shall either be confirmed or revised as a condition of project operation and the §401 Certification. Ecology shall develop an aesthetic flow monitoring program . . . .
>
> . . . .
>
> As a result of the monitoring program, Ecology shall make a finding of the aesthetic flows that meet the water quality standards for aesthetic purposes and is consistent with this Order. At the completion of the monitoring program, the Project shall operate subject to those flows and the §401 Certification shall be conditioned to reflect such flows, either confirming the current flow regime or revising it based on Ecology's findings.

## WATER RIGHTS LAW

Washington has a multistep procedure before new water rights can be acquired. Lummi Indian Nation v. Dep't of Ecology, 170 Wn.2d 247, 252, 241 P.3d 1220 (2010). Once a party has applied for a water right, Ecology determines what water, if any, is available and finds and determines to what beneficial use or uses it can be applied. RCW 90.03.290(1). If Ecology is satisfied that water is available and the proposed use is a beneficial use, it issues a permit specifying the amounts of water that can be taken and the beneficial uses to which that water may be applied. RCW 90.03.290(3). RCW 90.03.290

90.03.290 establishes a four part test that Ecology applies when considering an application for a water right permit. Postema v. Pollution Control Hr'gs Bd., 142 Wn.2d 68, 79, 11 P.3d 726 (2000). Under the statute, Ecology must affirmatively find (1) that water is available, (2) for a beneficial use, and that (3) an appropriation will not impair existing rights, or (4) be detrimental to the public welfare. RCW 90.03.290(3); Postema, 142 Wn.2d at 79. And, under RCW 90.03.290(1), if the application proposes to appropriate water for the purpose of power development, Ecology must investigate, determine and find whether the proposed development is likely to prove detrimental to the public interest, having in mind the highest feasible use of the waters belonging to the public. Where the proposed water use threatens to prove detrimental to the public interest, it shall be the duty of Ecology to reject the application and to refuse to issue the permit asked for. RCW 90.03.290(3).

A water right permit represents only an inchoate right, which does not become choate until the water right is perfected. Lummi, 170 Wn.2d at 253. Before the right is perfected, the applicant has only an incomplete appropriative right in good standing. Id. It remains in good standing so long as the requirements of law are being fulfilled, and it matures into an appropriative water right on completion of the last step provided by law. Id. RCW 90.03.330 governs water right certificates. Upon a showing satisfactory to Ecology that any appropriation has been perfected in accordance with the provisions of chapter 90.03 RCW, Ecology will issue to the applicant a certificate and it will be recorded with Ecology. RCW 90.03.330(1).

7

WATER RIGHT PROCEEDINGS

Shortly after the PCHB issued its final decision in the 401 Certification appeal, on August 6, 2013, Ecology issued a ROE and ordered the approval of Water Right Permit No. S4-35342.[4] The water right will authorize the PUD to withdraw an additional 600 cfs of water from the river behind the dam. The ROE noted that the only affected portion of the river would be the bypass reach with flows in the river otherwise remaining unchanged. Consequently, Ecology considered the use of the water to be non-consumptive,[5] except with regard to the bypass reach. The 10/30 minimum flows required by the 401 Certification were incorporated into the ROE:

> The water right holder must comply with Ecology's 401 Water Quality Certification No. 9007, related to licensing of the Enloe Hydroelectric Project (FERC No. 12569) on the Similkameen River, Okanogan County, Washington issued on July 13, 2012, and any subsequent updates.

The ROE also stated that if the 401 Certification is modified in the future, the water right would be subject to the conditions of the revised 401 Certification.

After Ecology issued the ROE, the Center for Environmental Law and Policy, American Whitewater, North Cascades Conservation Council (collectively "CELP"), and Columbia River Bioregional Education Project, appealed to the PCHB seeking that it find the ROE invalid. The PUD filed a motion for summary judgment on all issues raised. Ecology filed a joinder in support of the PUD's

---

[4] That ROE is the subject of this appeal.

[5] Water used consumptively diminishes the source and is not available for other uses. By contrast, non-consumptive water use does not diminish the source or impair future water use.

motion. On March 31, 2014, CELP filed a cross motion for summary judgment. CELP made three arguments. First, it argued that Ecology has not and cannot meet its statutory duty to make a final public interest determination under RCW 90.03.290 until it completes the aesthetic flow study mandated in the 401 Certification. Secondly, it argued that because Ecology lacked adequate information to make a public interest determination, it could only deny the water right or issue a preliminary permit. Finally, it asserted that the ROE does not condition the PUD's water right on the Similkameen's instream flows as required by WAC 173-549-020. Both parties agreed that there were no genuine issues of material fact and that the matter could be resolved on summary judgment.

On June 24, 2014, the PCHB issued an order granting summary judgment in favor of the PUD and Ecology:

> Ecology's approval of the application based on the terms and conditions of the ROE is AFFIRMED on all substantive grounds, with the exception that Ecology shall issue the permit with a condition that sets forth the protocol for the aesthetic flow study in the same language as the Board had ordered for the §401 Certification, and upon completion of the study the permit shall be amended specifying the aesthetic minimum instream flows that shall be protected if it is other than the 10/30 flows.

It concluded that a water right certificate shall not issue prior to the completion of the study and the permit amendment.

On July 24, 2014, CELP filed a petition for review[6] of the PCHB's decision in Thurston County Superior Court. It asserted that the PCHB's decision and the underlying ROE decision were arbitrary and capricious, because of their

---

[6] Columbia River Bioregional Education Project did not join the petition for review.

deliberate and unreasoned disregard of the facts and circumstances, including legal mandates set forth in RCW 90.03.290 and WAC 173-549-020. The superior court affirmed the PCHB's decision, reasoning that CELP failed to carry its burden of showing that the PCHB erred when it determined that it would be in the public interest to issue the ROE subject to the same criteria that additional facts be gathered as it did for the 401 Certification.

CELP filed a notice of appeal to this court, challenging the superior court's judgment upholding the PCHB's decision granting PUD and Ecology summary judgment.[7]

## DISCUSSION

CELP makes three main arguments in this appeal. First, it argues that the PCHB erred in finding that PUD's water permit complied with RCW 90.03.290's public welfare requirement. It contends this is so, because Ecology improperly made this determination in the face of incomplete information: the aesthetic study required by the 401 Certification is not yet complete. Secondly, it claims that when faced with this incomplete information Ecology had the discretion only to deny the permit or issue a preliminary permit—not issue the ROE. Finally, it argues that the PCHB erred in finding that the ROE did not violate the minimum instream requirements in WAC 173-549-020.

---

[7] Northwest Hydroelectric Association (NHA) filed an amicus curiae brief in this case opposing CELP's appeal. CELP argues that this court should disregard NHA's brief. And, in a motion to strike, CELP asserts that the panel should strike PUD's response to NHA's brief. Because we did not rely on the information in the amicus curiae brief—or in PUD's response—in reaching our decision, we need not rule on CELP's motion to strike.

10

We review PCHB orders under the Washington Administrative Procedures Act (WAPA).[8] Port of Seattle v. Pollution Control Hr'gs Bd., 151 Wn.2d 568, 587, 90 P.3d 659 (2004). This court reviews the PCHB's action from the same position as the superior court and applies WAPA standards directly to the PCHB's record. Skagit Hill Recycling, Inc. v. Skagit County, 162 Wn. App. 308, 317-18, 253 P.3d 1135 (2011). Under WAPA, the party challenging an administrative order or agency action—here, CELP—bears the burden of demonstrating its invalidity. Port of Seattle, 151 Wn.2d at 587; RCW 34.05.570(1)(a). WAPA authorizes relief in only certain circumstances, including if the agency's order is outside the statutory authority or jurisdiction of the agency, if the agency erroneously interprets or applies the law, or if the order is arbitrary and capricious. RCW 34.05.570(3). Administrative action is arbitrary and capricious if it is willful, unreasoned, and taken without regard to the facts and circumstances. Dep't of Ecology v. Theodoratus, 135 Wn.2d 582, 598, 957 P.2d 1241 (1998).

Where, as here, the original administrative decision was on summary judgment, the reviewing court overlays the WAPA standard of review with the summary judgment standard. Skagit Hill, 162 Wn. App. at 318. This court reviews the PCHB's ruling made on summary judgment de novo, making the same inquiry as the PCHB. Cornelius v. Dep't of Ecology, 182 Wn.2d 574, 585, 344 P.3d 199 (2015). This court's review is limited to the record before the PCHB. Puget Soundkeeper All. v. Pollution Control Hr'gs Bd., 189 Wn. App.

---

[8] Chapter 34.05 RCW

11

127, 135, 356 P.3d 753 (2015). Accordingly, this court reviews the facts in the record in the light most favorable to the nonmoving party. Skagit Hill, 162 Wn. App. at 318. Summary judgment is appropriate only where the undisputed material facts entitle the moving party to judgment as a matter of law. Id.

Ecology's decision to issue water appropriation permits under RCW 90.03.290 is discretionary and, therefore, will not be reversed absent a clear showing of abuse. Dep't of Ecology v. U.S. Bureau of Reclamation, 118 Wn.2d 761, 767, 827 P.2d 275 (1992).[9] A party seeking a reversal under this standard must show that the discretion was exercised in a manner which was manifestly unreasonable or exercised on untenable grounds or for untenable reasons. Id.

Here, the PCHB concluded that a water right certificate shall not issue prior to the completion of the aesthetic study. And, it affirmed Ecology's decision to issue a ROE on all substantive grounds.[10] Therefore, the ultimate issues we must decide are (1) whether Ecology had the authority to issue a ROE, ordering the approval of an inchoate water right subject to the condition that it be

---

[9] CELP argues that the standard of review is de novo. It notes that this case poses purely a legal question—whether Ecology properly interpreted and applied RCW 90.03.290 to authorize a water right in the face of incomplete information. But, the issue in Bureau of Reclamation—a case in which the court noted that Ecology's decision to issue water appropriation permits is discretionary—was whether Ecology abused its discretion in interpreting RCW 90.03.290. 118 Wn.2d at 767. To the extent that the issues in the case call for this court to determine whether Ecology properly interpreted RCW 90.03.290 when it issued the water right, we apply the abuse of discretion standard.

[10] The PCHB determined that Ecology shall issue the permit with specific language referencing the protocol for the aesthetic flow study in the same language as the PCHB had ordered for the 401 Certification. CELP does not challenge the PCHB's actions, only its final decision granting summary judgment.

potentially later revised to adhere to the flows deemed sufficient by a future aesthetic study and (2) whether it abused its discretion in doing so.

I. Public Interest

CELP asserts that the PCHB erroneously interpreted and applied the law by affirming Ecology's issuance of the ROE when the 401 Certification study had not yet been completed. It contends that it was contrary to law for the PCHB to assume as a matter of law that there will be no detriment to the public interest when it is undisputed that additional information is needed to make the public interest[11] determination. CELP asserts that because there is no credible evidence yet as to how the 10/30 flows will appear aesthetically over the dam and the falls, that Ecology could not make the public interest finding.

RCW 90.03.290 establishes a four part test that Ecology applies when considering an application for a water right. Postema, 142 Wn.2d at 79. Under the statute, Ecology must affirmatively find (1) that water is available, (2) for a beneficial use, and that (3) an appropriation will not impair existing rights, or (4) be detrimental to the public welfare.[12] RCW 90.03.290(3); Postema, 142 Wn.2d

---

[11] The parties somewhat interchangeably use "public interest" and "public welfare." This is likely because RCW 90.30.290 refers to both. The use of the different terms does not appear to impact the parties' arguments nor does it impact our analysis.

[12] We note that Ecology and PUD emphasize that Ecology need only make a finding that the Project would not likely prove detrimental to the public welfare. While RCW 90.03.290(1) states that if a proposed water appropriation is for the purpose of power development, Ecology's investigation should focus on finding whether the proposed development is likely to prove detrimental to the public interest, RCW 90.03.290(3) states that Ecology must enter a finding that the water will not be detrimental to the public welfare. Thus, this distinction is ultimately immaterial to determining whether Ecology had the authority to

at 79. Aesthetics is a component of the public interest analysis. See RCW 90.54.020(1). Management and utilization of Washington waters are guided by a general declaration of fundamentals in RCW 90.54.020. RCW 90.54.020(1) establishes which uses of water are deemed beneficial. Use for hydroelectric power production and preservation of environmental and aesthetic values is considered beneficial. Id. RCW 90.54.020(3)(a) states that the quality of the natural environment shall be protected and, where possible, enhanced such that perennial rivers and streams shall be retained with base flows necessary to provide for preservation of wildlife, scenic, aesthetic and other environmental values, and navigational values.

While evaluating the Project, Ecology considered the four part test outlined in RCW 90.03.290. In so doing, Ecology did not ignore the fact that aesthetics is a necessary component of the public interest finding. It squarely acknowledged the necessity of protecting aesthetics. In the 401 Certification appeal, the PCHB noted there was evidence in the record that flows could not be manipulated under existing conditions. There was testimony that collecting good data and taking accurate measurements in the bypass reach for the purpose of analyzing different flow regimes over the falls would be dangerous based on the velocity of the flows. In order to get the necessary facts to address the aesthetics issue, the Project had to proceed subject to further study.

---

condition the water right on the flow monitoring study before it had the results of the study.

14

Ecology incorporated the same study conditions that the PCHB imposed on the 401 Certification—which were based on this same statutory aesthetics provision—to ensure that the spirit of the law was carried out.[13] As to the public welfare requirement, Ecology found:

> Given that this project will produce valuable electrical energy and will do so in a sustainable manner, that the impacts on the bypass reach are reduced from those under previous project scenarios, that minimum instream flows necessary to protect the aesthetic and instream resources in the bypass reach will be a required condition of project operation, and that any negative impacts are further mitigated by the downstream discharge channel, there is no basis on which to determine that this project will be detrimental to the public welfare.

The PCHB addressed whether this finding could be made and should be sustained:

> This case is unique because the §401 Certification has already been approved with a condition for a study to determine the aesthetic flows. Ecology will be developing these aesthetic flows in compliance with the Water Resources Act of 1971, ch. 90.54 RCW, which requires the protection of designated beneficial uses such as aesthetics, and using the authority of the water code for issuing water rights and the CWA for issuing a §401 Certification. In their appeal of the ROE, the Appellants specify that they "do not seek additional aesthetic analysis outside of the 401 Certification Process or challenge the sufficiency of the aesthetic flow-monitoring program required in the PCHB's 401 Certification decision." Under these circumstances, Ecology properly exercised its discretion to authorize the permit and address the public interest requirements of preserving aesthetic values with similar requirements in the §401 Certification.

---

[13] CELP argues that because water rights and 401 Certifications are distinct permits with different purposes that are issued pursuant to different statutory authority and standards, it was error for the PCHB to base its public interest finding on the outcome of the 401 Certification aesthetic flow test. But, the PCHB did not base its public interest finding on the outcome of that test. It made the finding subject to the condition that the ROE eventually adhere to the flows deemed acceptable in the aesthetic flow test.

Further, unlike in Black Rock[14] or Squaxin Island[15], this is not a case in which available information shows that the applicant cannot meet some aspect of the four-part test for a water right. Rather, the Board concluded that some additional assessment is needed to finalize the appropriate level of aesthetically protective flows on the Similkameen River in the area of the project.

(Internal citations omitted.) We agree with this analysis. And, the PCHB specifically added language mandating that a final water right certificate cannot issue prior to the completion of the aesthetic study and the permit amendment, if necessary.[16] On this record, Ecology's finding that the public welfare requirement was satisfied was not arbitrary and capricious. Ecology did not abuse its discretion approving the ROE with the conditions imposed.

Next, CELP maintains that because the PCHB found that additional monitoring and analysis of actual minimum flows is necessary to assess the

---

[14] Black Star Ranch Neigh. Ass'n v. Dep't of Ecology, No. 87-19 (Wash. Pollution Control Hr'gs Bd. Feb. 19, 1988) (It is clear from the record that the PCHB's reference to "Black Rock" was in fact a reference to "Black Star.").

[15] Squaxin Island Tribe v. Dep't of Ecology, No. 05-137 (Wash. Pollution Control Hr'gs Bd. Nov. 20, 2006).

[16] CELP asserts that the study required by the 401 Certification may show that there is no flow level that protects both aesthetic values and the fishery resource—a higher minimum flow may result in too high of temperatures in the bypass reach. And, it asserts that it is possible that the aesthetic flow study could result in a required flow that is so high that it renders the Project uneconomical and unacceptable to PUD. We accept that this is a possibility. In fact, we acknowledge at least three possibilities: (1) The study may indicate that either the 10/30 flows or a different flow level is protective of aesthetics, the fishery resource, and would be sufficient to support the Project; (2) The study may indicate that there is no flow level that is protective of both the fishery resource and aesthetics, and Ecology may withdraw the water right permit; (3) The study may indicate that there is no flow level that is protective of both the fishery resource and aesthetics, and Ecology may still decide to issue the final water certificate. Importantly, Ecology's decision to amend or not amend the conditions after the study will be subject to challenge.

16

proper protection of aesthetic values, Ecology's discretion was limited by statute to either deny the permit or issue a preliminary permit.

RCW 90.03.290(2)(a) states that if a water appropriation application does not contain and the applicant does not promptly furnish sufficient information on which to base findings that the proposed development is not likely to prove detrimental to the public interest, Ecology may issue a preliminary permit. The permit may be valid for up to three years while requiring the applicant to complete investigations or studies. RCW 90.03.290(2)(a). CELP recognizes that the language of this statute is clearly discretionary.

CELP also agrees Ecology has the inherent authority in its discretion to impose conditions on any permit it issues. See Theodoratus, 135 Wn.2d at 597 (stating that generally, an agency which has authority to issue or deny permits has authority to condition them); State v. Crown Zellerbach Corp., 92 Wn.2d 894, 899-900, 602 P.2d 1172 (1979) ("[T]he power to disapprove [a permit] necessarily implies the power to condition an approval."). However, it asserts that when the information to make one of the four required findings under the statute is lacking, a preliminary permit is the only mechanism for the permit application to move forward.

The PCHB responded to this argument by noting:

> The Board finds [RCW 90.03.290(2)(a)] to be unambiguous. See State v. Keller, 143 Wn.2d 267, 276, 19 P.3d 1030 (2001) ("The courts do not engage in statutory interpretation of a statute that is not ambiguous[.]"). Rather than limiting Ecology's authority to issue a permanent new water right, the plain language of the statute provides Ecology with authority to issue a different kind of permit (a "preliminary permit") that ensures the application can remain in

good standing while the applicant undertakes "such surveys, investigations, studies, and progress reports, as in the opinion of the department may be necessary." RCW 90.03.290(2)(a). The decision whether to issue a preliminary permit in lieu of a permanent new water right, when information is incomplete on an aspect of the four-part test, is still a choice that remains within Ecology's discretion.

We agree. The statute is not ambiguous and does not require construction. Nothing in RCW 90.03.290(2) limits Ecology's authority to impose conditions on permits that are not issued pursuant to that section. Therefore, we reject CELP's argument that Ecology had the authority to issue only a preliminary permit or to deny the permit.

We conclude that Ecology had authority to issue a ROE, and water permit, which was subject to a condition to ascertain information that was not available prior to proceeding with the Project. Ecology did not abuse its discretion in determining that the PUD's water permit should issue subject to the stated conditions. We hold that the PCHB properly granted respondents' motion for summary judgment on these issues.

## II. Minimum Instream Flow Rule

Next CELP argues that the PCHB erred when it found that the ROE did not violate the minimum flow requirements in WAC 173-549-020. WAC 173-549-020(2) establishes a minimum instream flow for the Similkameen River—between 400 cfs and 3,400 cfs depending upon the month. WAC 173-549-020(5), however, states that projects that would reduce the flow in a portion of the stream's length (such as a hydroelectric project that bypasses a portion of the stream) will be subject to instream flows as specified by Ecology. The flows may

be those established in WAC 173-549-020 or, when appropriate, may be flows specifically tailored to that particular project and stream reach. WAC 173-549-020(5).

The PCHB found that WAC 173-549-020(5) explicitly excludes those projects that reduce the flow in only a portion of a stream's length from compliance with the minimum instream flows established by WAC 173-549-020(2). As a result, it found that the minimum instream flows for the Similkameen River in WAC 173-549-020(2) do not apply to the Project unless Ecology decides to apply those flows in its discretion.

This court shows deference to an agency's interpretation of its own regulations. Puget Soundkeeper, 189 Wn. App. at 136. Nonetheless, the agency's interpretation is not binding and deference to an agency is inappropriate where the agency's interpretation conflicts with a statutory mandate. Id. To interpret agency regulations, this court applies the same principles used to interpret statutes. Id.

CELP argues that the ROE improperly invoked the exception in WAC 173-549-020(5) and does not condition PUD's water right on the minimum instream flows as required by law. CELP notes that the general rule for instream flows is outlined in RCW 90.03.247 ("Whenever an application for a permit to make beneficial use of public waters is approved relating to a stream or other water body for which minimum flows or levels have been adopted and are in effect at the time of approval, the permit shall be conditioned to protect the levels or flows."). CELP notes that there is only one statutory exception to the general

19

rule—RCW 90.54.020(3)(a). RCW 90.54.020(3)(a) states that withdrawals of water which conflict with base flows necessary to provide for preservation of wildlife, fish, scenic, aesthetic and other environmental values shall be authorized in only those situations where it is clear that overriding considerations of the public interest (OCPI) shall be served.

CELP maintains that even if the regulatory exception outlined in WAC 173-549-020(5) applies, all water right applications must first satisfy the OCPI exception in RCW 90.54.020(3)(a). CELP asserts there was no such finding here. CELP cites to <u>Swinomish Indian Tribal Community. v. Department of Ecology</u>, 178 Wn.2d 571, 311 P.3d 6 (2013), to support its assertion. In <u>Swinomish</u>, Ecology issued an amended instream rule. <u>Id.</u> at 577-78. That rule authorized appropriations of water that would impair the minimum instream flows based on Ecology's finding that the uses of the water were for "overriding considerations of the public interest" pursuant to RCW 90.54.020(3). 178 Wn.2d at 576. The <u>Swinomish</u> court held that the OCPI exception does not permit Ecology to reallocate water that is needed to maintain the instream flows through reservations of water for future beneficial uses. <u>Id.</u> at 602.

CELP also cites to <u>Foster v. Department of Ecology</u>, 184 Wn.2d 465, 362 P.3d 959 (2015) to support its assertion. <u>Foster</u> involved a challenge to a water right permit issued by Ecology to a city. <u>Id.</u> at 468-69. The city's application was for a municipal water permit to meet the water needs of the city's growing population. <u>Id.</u> at 469. Because the appropriation would impair the minimum flows of two waterways, the city created a mitigation plan and Ecology approved

the permit conditioned on the mitigation plan. Id. at 469. Citing to Swinomish, the Foster court held that Ecology exceeded its authority by approving the city's water permit under the narrow OCPI exception, because the exception permits only temporary impairment of minimum flows—not the permanent impairment of minimum flows. Id. at 474-75. CELP argues that likewise, here, the water right would permanently impair the instream flows adopted in the minimum instream flow rule. It argues that permanent impairment of an instream flow under the guise of an exception that is not compliant with RCW 90.54.020 is precisely what Foster forbids.

Unlike in Swinomish and Foster, Ecology did not approve the water right under the OCPI exception. And, this was not because Ecology erroneously skipped over the OCPI exception step. Instead, Ecology did not need to invoke that exception, because it invoked the regulatory exception in WAC 173-549-020(5)—a rule promulgated under chapters 90.22 RCW and 90.54 RCW.[17] RCW 90.22.010 grants Ecology express authority to establish minimum water flows. And, RCW 90.54.040 provides that Ecology is directed, through the adoption of rules, to insure that the waters of the state are utilized in the best interest of the people. WAC 173-549-020(1) establishes the minimum instream flows for the Similkameen River. And, WAC 173-549-020(5) provides a minimum instream flow exception for hydroelectric projects such as the PUD's that are consumptive for only a portion of the stream's length. Chapter 90.22 RCW and 90.54 RCW

---

[17] RCW 90.03.247 also establishes that Ecology has the exclusive authority to establish minimum flows and levels.

21

authorized the adoption of WAC 173-549-020, and it went through the rulemaking process. Therefore, whether Ecology can decrease the minimum instream flow via a regulatory exception has been resolved. Notably, CELP does not challenge the validity of WAC 173-549-020. The plain language of WAC 173-549-020(5) is clear, and it carves out a regulatory exception to WAC 173-549-020(1) and (2)'s minimum flows notwithstanding the statutory OCPI exception in RCW 90.54.020(3)(a).

Still, CELP contends that when Ecology invokes the exception set forth in WAC 173-549-020(5), which authorizes a deviation from the instream flows set by rule, it must do so in a manner that complies with the requirements of RCW 90.54.020(3)(a). CELP argues that, in this case, Ecology failed to comply with RCW 90.54.020 by "specifically tailoring" flows for the Project as is required under WAC 173-549-020(5). CELP maintains that "specifically tailor" implies that there must be some basis to justify the alternative flow. And, that Ecology's exclusive reliance on flows that have been deemed in need of further study by the PCHB was not a "specific tailoring" to the Project and stream reach.

But, the aesthetic flow testing required by the 401 Certification and incorporated into the ROE is plainly designed to result in instream flows that are specifically tailored to the particular circumstances of the Project. CELP provides no support for its implicit assertion that the flows specifically tailored to the Project need be definitively determined before issuance of the ROE. The flow study required by the 401 Certification may confirm that the 10/30 flows are protective of aesthetic values, in which case the flows need not change, or it may

trigger amendment of the flows in the 401 Certification and the ROE. In other words, the flows will be specifically tailored. CELP did not carry its burden of demonstrating that the ROE violates the minimum instream flow rule. Consequently, we hold that the PCHB did not err when it granted summary judgment on this issue.[18]

We affirm.

WE CONCUR:

---

[18] Because CELP is not the prevailing party, its request that this court award it attorney fees and costs pursuant to RCW 4.84.350 is moot.

23